UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　　　Plaintiff,　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　v.　　　　　　　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| $6,819,750.00 OF FUNDS IN THE NAME　） | |
| OF MILENYUM ENERGY SA;　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| $4,947,700.00 OF FUNDS IN THE NAME　） | |
| OF MILENYUM ENERGY SA;　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| $3,999,775.90 OF BLOCKED FUNDS IN　）　Civil Action No. _____ | |
| THE NAME OF BLUE ENERGY TRADE　） | |
| LTD CO.;　　　　　　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| $2,991,000.00 OF BLOCKED FUNDS IN　） | |
| THE NAME OF BLUE ENERGY TRADE　） | |
| LTD CO.; and　　　　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| $1,380,738.31 OF BLOCKED FUNDS IN　） | |
| THE NAME OF BLUE ENERGY TRADE　） | |
| LTD CO.,　　　　　　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　　　Defendants.　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff the United States of America, by and through the United States

Attorney for the District of Columbia, and brings this verified complaint for forfeiture in a civil

action *in rem* against the defendant properties, namely: (1) $6,819,750.00 of funds in the name of

Milenyum Energy SA ("Milenyum") sent by Nojoom Almerikh General Trading ("Nojoom") held

at U.S. Bank 1 ("Target Funds 1"); (2) $4,947,700.00 ("Target Funds 2") of funds in the name of

Milenyum sent by Nojoom held at U.S. Bank 1; (3) $3,999,775.90[1] of funds in the name of Blue

Energy Trade LTD Co. ("Blue Energy") sent by Al Reef Trading Co. LLC ("Al Reef") held at

U.S. Bank 2 ("Target Funds 3"); (4) $2,991,000.00 of funds in the name of Blue Energy sent by

Inpenta Group LP held at U.S. Bank 1 ("Target Funds 4"); and (5) $1,380,738.31 in the name of

Blue Energy, sent by Benelux Overseas DMCC held at U.S. Bank 1 ("Target Funds 5")

(collectively, "the Defendant Funds").[2]   The United States alleges as follows.

### NATURE OF ACTION AND THE DEFENDANT *IN REM*

1.      This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of

Investigation ("FBI") of a scheme to launder funds via U.S. correspondent accounts as part of an

illicit procurement network for the purpose of evading U.S. sanctions related to the Syrian Arab

Republic ("Syria").   Nojoom, Milenyum, Blue Energy, and their co-conspirators employed

sophisticated evasion techniques and an extensive network of front companies in dealing with the

U.S. financial system to disguise the true nature of their illicit business dealings, as well as to

protect and promote the on-going illicit procurement scheme.   Their actions evidence a long-term

conspiracy to illegally procure items for, or on behalf of, sanctioned entities in violation of the

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705 *et seq*., and the

federal money laundering statute, Title 18, United States Code, Section 1956.

2.      The Defendant Funds are subject to forfeiture pursuant to Title 18, United States

Code, Section 981(a)(1)(A), as property involved in and traceable to violations of money

---

[1]      The $3,999,775.90 of funds in the name of Blue Energy Trade LTD Co. are composed of six
payments made over a two day period totaling $3,999,775.90.   The specific amounts sent were:
$754,962.65, $564,962.65, $679,962.65, and $694,962.65 sent on April 21, 2015; and $774,962.65 and
$529,962.65 sent on April 22, 2015.   These payments all described the same parties and the same wire
reference.   This Complaint will accordingly refer to these payments collectively for expediency.

[2]      The Defendant Funds were blocked pursuant to Executive Order 13582, described further below.

laundering activity related to IEEPA violations.  See Title 18, United States Code, Section 1956(h), 1956(a)(2)(A).  The defendant funds are also subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), as property constituting or derived from proceeds traceable to violations of IEEPA, codified at Title 50, United States Code, Section 1701 *et seq.*

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355.

4.      Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia.  The Defendant Funds are currently held in bank accounts located in the United States at U.S. Bank 1 and U.S Bank 2.  The co-conspirators (identified below) are Specially Designated Nationals ("SDNs").  They failed to seek the requisite licenses from the Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C., to conduct these transactions with these funds in violation of U.S. law.

## STATUTORY FRAMEWORK

## I.      IEEPA AND RELATED EXECUTIVE ORDER REGARDING SYRIA

5.      This civil forfeiture action relates to violations of the regulations and Executive Orders issued pursuant to IEEPA, codified at Title 50, United States Code, Section 1701 *et seq.* IEEPA gives the President certain powers, defined in Section 1702, to deal with any threats, which have their source in whole or in substantial part outside the United States, to the national security, foreign policy, or economy of the United States.  IEEPA authorizes the President to declare a national emergency with respect to that threat, and IEEPA prescribes criminal penalties for violations thereunder.  See Title 50, United States Code, Section 1705(a).  A conspiracy to violate

IEEPA is prohibited by both Section 1705(a) of IEEPA and Title 18, United States Code, Section 371.

6.      According to Executive Order (hereinafter "E.O.") 13582, "Blocking Property of the Government of Syria and Prohibiting Certain Transactions With Respect to Syria," all property and interests in property of those individuals and entities designated by E.O. 13582, which are in the United States, come into the United States, or come within the possession of a United States person, are blocked.

7.      Entities designated by E.O. 13582 include (i) the Bashar al-Assad led Government of Syria, including all of its agencies, instrumentalities, and controlled entities; (ii) any person determined by the Secretary of the Treasury "to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, any person whose property and interests in property are blocked pursuant to" E.O. 13582; and (iii) any person determined by the Secretary of the Treasury "to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to" E.O. 13582.

8.      In effect, E.O. 13582 and IEEPA bar any blocked person or entity from using the United States financial system, including through correspondent banking transactions occurring in whole or in part in the United States.

9.      Additionally, any transaction conducted within the United States which evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in E.O. 13582, is similarly prohibited.

10.      IEEPA makes it a crime to willfully commit, attempt to commit, conspire to commit, or aid and abet in the commission of any violation of E.O. 13582.

## II.     MONEY LAUNDERING STATUTE

11.     Pursuant to Title 18, United States Code, Section 1956(a)(2)(A), it is a violation to transport, transmit, or transfer, or to attempt to transport, transmit, or transfer a monetary instrument or funds, *inter alia*, to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

12.     Pursuant to Title 18, United States Code, Section 1956(c)(7)(D), the term "specified unlawful activity," includes IEEPA violations.

13.     Pursuant to Title 18, United States Code, Section 1956(h), it is unlawful to conspire to violate Section 1956.

## III.     THE FORFEITURE STATUTES

14.     Pursuant to Title 18, United States Code, Section 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, or any property traceable to such property is subject to forfeiture.  Forfeiture pursuant to this statute applies to more than just the proceeds of a specific crime.  Forfeiture sought in connection with a violation of the money laundering statute applies to all property "involved in" the crime, which can include all funds commingled with money derived from illicit sources.

15.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA, or a conspiracy to violate IEEPA, is subject to forfeiture.

## <u>FACTS GIVING RISE TO FORFEITURE</u>

## I.     BACKGROUND

### A.     The Syrian Regime

16.     Syria has been designated, and has been sanctioned as a State Sponsor of Terrorism since December 1979.  Additional sanctions were added in May 2004 via E.O. 13582. Subsequent

Executive Orders have imposed additional sanctions targeting, among others, the President of Syria, Bashar al-Assad ("Assad"). On May 18, 2011, the U.S. Department of Treasury designated Assad and his chief lieutenants for human rights abuses, including repression of the Syrian people, as well as benefitting from rampant corruption.

17.     In 2011, prior to the unrest caused by the Syrian civil war, Syria was the largest fuel producer in the Eastern Mediterranean region, producing approximately 400,000 barrels of oil and gas per day. This revenue from the sale of this oil accounted for approximately twenty-five percent of the Syrian government's revenues and provided essential fuel for Assad's military. Estimates from 2014 indicate Assad's oil and gas production dramatically decreased to approximately 25,000 barrels per day, resulting in billions of dollars of lost revenue. Syria has attempted to make up this deficit in fuel through imports from Iran, Iraq, and Russia, often using commercial companies as intermediaries. The U.S. Department of Treasury has designated many of the companies that have facilitated oil and gas shipments to the Assad regime.

**B.      Syria Petroleum Network Designations**

18.     On September 25, 2012, the U.S. Department of State sanctioned Syria's state oil marketing firm, SYTROL, under the Iran Sanctions Act.  Estimates indicate that Syrian oil and gas production decreased dramatically after this designation, requiring Syria to increase importation from third party countries as noted above.  Many of these imports have passed through the Syrian port of Banias (hereinafter, "Port Banias").

19.     On August 19, 2011, OFAC designated multiple state-owned companies in the Syrian petroleum industry, including the Syrian Company for Oil Transportation ("SCOT") and SYTROL.  On May 8, 2014, OFAC designated the Banias Refinery Company, which processes petroleum imported into the Port Banias. OFAC noted in subsequent designations that millions of

dollars' worth of energy products, such as liquefied petroleum gas ("LPG") and gasoil, arrive into Syria through Port Banias. Several illicit activities, such as the delivery of oil at Port Banias and payment for oil exchanged in U.S. Dollars, led OFAC to discover, and ultimately sanction, multiple petroleum supply networks servicing Syria and Syrian entities.

20.     One of those suppliers is Pangates International Corporation Ltd., a company that helped sanctioned Syrian entities to procure petroleum products.  On July 9, 2014, OFAC designated Pangates for supplying petroleum products to the government of Syria, including SYTROL.  In its designation, OFAC stated that the petroleum products were used primarily for military purposes in Syria.  Jamal Abdulkarim, who is a U.S. permanent resident residing in Syria, was the President of this company and the Syrian contact for the company.

21.     On December 17, 2014, OFAC also designated the Abdulkarim Group, the parent company of Pangates.  Jamal Abdulkarim listed himself, at a Syrian address, as the contact for this company on the Arab Federation for Engineering Industries website. In its designation, OFAC stated that, in 2014, Pangates and the Abdulkarim Group worked to arrange shipments of base oils and aviation gasoline to Syria.

22.     On August 3, 2015, OFAC designated multiple companies and individuals that worked with the Abdulkarim Group to ship petroleum to Syria.  OFAC stated that Wael Abdulkarim (Jamal's brother) worked with a Syrian company, The Eagles LLC, to pay Turkish company Milenyum $5 million in March 2015 for gasoil intended for Syria. OFAC further designated Milenyum, its key employees, and a number of shell companies and petroleum tankers operating on behalf of Milenyum at this time.  OFAC additionally designated a number of companies that provided services to Syrian ports, including the Syrian Shipping Agencies Company ("SHIPCO").

23.    The designated entities and individuals included the following:

a.    **The Eagles LLC (The Eagles)**:  The Eagles was a Syria-based company that was designated for being owned or controlled by Wael Abdulkarim and the Abdulkarim Group.  In early February 2015, The Eagles was among several companies doing business with the U.S- and E.U.-designated SYTROL.  In early March 2015, Wael Abdulkarim worked with The Eagles to pay Milenyum Energy S.A. (Milenyum) nearly $5 million for a shipment of gasoil that Milenyum was believed to have provided to The Eagles for shipment to Syria.

b.    **Milenyum Energy S.A. (Milenyum)**:  Milenyum, a company registered in Panama and operating in Turkey, was designated for having materially assisted the U.S.- and E.U.-designated Abdulkarim Group and Wael Abdulkarim.  Milenyum was also designated for regularly arranging for the shipment of products such as liquefied petroleum gas (LPG) and gasoil to the Syrian Government-controlled port of Banias, likely for SYTROL or other Syrian government entities.  In early February 2015, The Eagles coordinated with Ufuk Kenar – the director of Milenyum who was also designated – to arrange a shipment of 15,000 metric tons of gasoil worth over $7 million to Syria.  In mid-April 2015, employees of Milenyum may have been involved in the shipment of thousands of metric tons of LPG to Banias, Syria, on board the Green Light, a vessel that is owned and controlled by Milenyum.  In mid-February 2015, Milenyum facilitated a gasoil shipment to Syria on behalf of an Abdulkarim Group front company.  In mid-February 2015, the Tala, a vessel that is owned and controlled by Milenyum, delivered several thousand metric tons of LPG from Ukraine to Banias, Syria.  In

mid-March 2015, the Blue Way, a vessel owned and controlled by Milenyum, loaded several thousand metric tons of LPG likely destined for Banias, Syria.

c. **Blue Energy Trade Limited Company (Blue Energy) and Ebla Trade Services S.A.L/Off-Shore (Ebla Trade)**: Blue Energy, a company registered in St. Kitts and Nevis, and Ebla Trade, a Beirut, Lebanon-based company, were designated for being owned and controlled by Milenyum. They were also designated for having provided or goods or services in support of the Government of Syria. Milenyum uses Blue Energy to receive payments for energy-related shipments through the port of Banias, Syria. As of April 2008, Milenyum worked with Ebla Trade and Blue Energy to facilitate payments related to commercial vessel shipments of petroleum products to Syria. In early April 2015, Milenyum employees worked with Blue Energy and Ebla Trade to arrange for the Tala, a vessel that is owned and controlled by Milenyum, to discharge LPG valued at over $1.2 million in Banias, Syria. Blue Energy shipped the LPG and Ebla Trade cosigned it. In mid-March 2015, Milenyum received payment through Blue Energy for a shipment of several thousand metric tons of LPG likely destined for Banias, Syria.

d. **Green Shipping Ltd. and Aqua Shipping Ltd.**: Green Shipping Ltd. and Aqua Shipping Ltd., companies operating out of Turkey and registered in the Marshall Islands were designated for being owned and controlled by Milenyum and because Milenyum used them as front companies to register ownership of vessels.

e. **Ufuk Kenar**: Ufuk Kenar was designated for having acted on behalf of Milenyum and the Government of Syria. Kenar is a director and secretary of Milenyum.

f.  **Erkan and Serkan Duzgoren**:  Erkan and Serkan Duzgoren are the two managers of Milenyum and were designated for having acted on behalf of Milenyum.

g.  **Mustafa Aydin**:  Mustafa Aydin, an employee of Milenyum, was designated for having acted on behalf of Milenyum, Blue Energy, and the Abdulkarim Group.

h.  **Blocked Shipping Vessels and Entities**:  The Tala, Blue Dream, Green Light, Mariana, Aqua, Blue Way, and Blue Gas are shipping vessels owned or controlled by Milenyum.

24.    On June 12, 2018, five Russians and three Syrians were indicted for paying in U.S. dollars to ship jet fuel to Syria.  Syrian petroleum inspector Yaser Naser ("Naser") was one of the individuals charged in this indictment, in part because he invoiced orders to Nojoom and used Nojoom to receive payments for shipments to Syria.  Nojoom also paid Milenyum millions of dollars for petroleum that was sent to Syria.

### C.    Background on Geolocational Data Recorded on Large Tonnage Ships

25.    This forfeiture involves the illicit smuggling of petroleum products to ports serviced by designated entities in Syria.  The petroleum tankers involved are legally required to use an Automated Identification System ("AIS").[3] AIS acts like a transponder that transmits a ship's location information (based on GPS) via radio.  AIS is a safety feature that notifies other vessels of a vessel's location.  International maritime regulations require petroleum tankers over a specified gross tonnage to keep AIS on when a tanker is at sea; however, many tankers operating

---

[3] AIS, a maritime GPS system, was developed in the 1990s as a safety feature which exchanges vessel information electronically with other nearby ships. Shipboard AIS became a requirement based on the International Maritime Organization's International Convention for the Safety of Life at Sea on the vessels described below as of December 31, 2004.

on behalf of sanctioned entities turn this safety system off in the course of conducting illicit activities to conceal their location and who they are doing business with.

26.     For example, press reports show that two petroleum tankers, the Maestro and the Venice, turned their AIS off to conduct a ship-to-ship transfer of petroleum products in the Kerch Strait[4] on January 21, 2019.   The Maestro was formerly named the Green Light, and was designated along with Milenyum on August 3, 2015, preventing the tanker from operating at many ports.  During this January 21, 2019 transfer, both tankers exploded and the non-functioning AIS delayed emergency responders, resulting in the deaths of at least 10 crewmembers.

27.     AIS data has confirmed that several tankers belonging to or associated with Milenyum traveled to Port Banias numerous times in 2015.  Moreover, details of international wire payments made by a number of companies involved with illicit shipments to Syria, including Milenyum and its associates, contained data describing transactions involving "LPG [liquid petroleum gas] Cargo," the importation of oil products, and referenced specific petroleum tankers. Milenyum and its associated companies sent and received those funds at or about the same time Milenyum affiliated petroleum tankers were located around Port Banias.

## II.     Shipments to Port Banias

28.     Despite the designation of Syria, its senior leaders and the various entities associated with Port Banias, multiple petroleum tankers continued to make deliveries there on behalf of Milenyum and Blue Energy.  Among these were: 1) the Sea Light; 2) the Breithorn; and 3) several tankers associated with Benelux Overseas DMCC (a United Arab Emirates  based company), including the "Gitta Gas," the "Iris Gas" which changed its name to the "Isis Gas," and

---

[4] The Kerch Straight connects the Black Sea and the Sea of Azov, separating the Kerch Peninsula of Crimea in the west and the Taman Peninsula of Russia in the east.

the "Warwick gas" which changed its name to the "Iris Gas."

    A.    <u>Voyages of the Milenyum Petroleum Tanker Sea Light to Port Banias</u>

    29.    The Sea Light is a petroleum tanker that operated in the Mediterranean and Black Seas in 2014 and 2015.  It has the capacity to carry in excess of 11,000 metric tons of liquid petroleum products.

    30.    During the period between December 2014 and May 2015, the Sea Light made at least seven trips to Port Banias.  At least five, if not all seven, of those trips were on behalf of Milenyum.

    31.    <u>Trip No. 1 – December 2014</u> – On or about December 27, 2014, the Sea Light was at Port Banias and discharged approximately 9513.888 units of gasoline at the Port Banias refinery.

    32.    <u>Trip No. 2 - January 2015</u> – Pursuant to a Milenyum charter, the Sea Light loaded gasoil from Kulevi, Georgia and discharged it at Port Banias.  It arrived at Port Banias on or about January 20, 2015 and remained there until January 24, 2015.  The tanker's AIS was turned off as it approached Port Banias, and remained off between January 19, 2015 and January 24, 2015.  On or about January 24, 2015, the Sea Light discharged approximately 10,989.351 units of gasoil at Port Banias.

    33.    <u>Trip No. 3 – January/February 2015</u> - On January 28, 2015, after docking at the petroleum tank farm at Agioi Theodoroi, Greece, the Sea Light traveled in the direction of Port Banias.   The tanker's AIS was turned off as it approached Port Banias, and remained off from January 30 through February 2, 2015.  On or about February 2, 2015, the Sea Light discharged 9,884.651 units of gasoline at Port Banias.

    34.    <u>Trip No. 4 – February 2015</u> – On or about February 19, 2015, pursuant to a Milenyum charter, the Sea Light loaded gasoil from Kulevi, Georgia for discharge at Port Banias.

The tanker's AIS was turned off as it approached Port Banias, and remained off from February 16 through February 26, 2015.  On or about February 25, 2015, the Sea Light disconnected its hoses at Port Banias.

35.    On February 11, 2015, Milenyum chartered the Sea Light for three more consecutive voyages from Kavkas, Russia and Kulevi, Georgia to Port Banias, as detailed below.

36.    Trip No. 5 – March 2015 - On or about March 10, 2015, the Sea Light departed the Russian bulk petroleum terminal near Volna, Russia.  Thereafter, the tanker's AIS was turned off as it approached Port Banias, and remained off from March 16, 2015 through March 22, 2015.  On or about March 20, 2015, the Sea Light disconnected its hoses at Port Banias.

37.    Trip No. 6 – March-April 2015 - On or about March 29, 2015 the Sea Light received petroleum from Kulevi, Georgia.  The tanker's AIS was turned off as it approached Port Banias, and remained off from April 5, 2015 through April 12, 2015.  This petroleum was delivered to Berth 6 at Port Banias.  Berth 6 is operated by the Syrian Company for Oil Transport, which was designated by OFAC on August 18, 2011. On or about April 12, 2015, the Sea Light disconnected its hoses at Port Banias.

38.    Trip No. 7 – April-May 2015 - On or about April 17, 2015 the Sea Light received petroleum from Kulevi, Georgia.  The tanker's AIS was turned off as it approached Port Banias, and remained off from April 30, 2015 through May 11, 2015.  This petroleum was delivered to Berth 6 at Port Banias.  As noted above, Berth 6 is operated by the Syrian Company for Oil Transport, which was designated by OFAC on August 18, 2011.  On or about May 10, 2015, the Sea Light disconnected its hoses at Port Banias.

B.    Voyages of Other Milenyum Petroleum Tankers to Port Banias

39.    Milenyum has five other tankers that also transported petroleum products to Port

Banias between December 2014 and October 2015.  These include the Blue Dram, the Blue Way, the Venice, the Maestro and the Golden Sea.  Together, these tankers discharged petroleum products at least seven separate times at Port Banias.

40.     The petroleum tanker Blue Dream delivered liquefied petroleum gas to Port Banias once in December 2014 and a second time in February 2015.

41.     The petroleum tanker Tala delivered liquefied petroleum gas to Port Banias once in December 2014 and a second time in January 2015.

42.     The petroleum tanker Blue Way delivered liquefied petroleum gas to Port Banias twice in January 2015.

43.     The petroleum tanker Venice delivered liquefied petroleum gas to Port Banias once in October 2015.

44.     The petroleum tanker Maestro delivered liquefied petroleum gas to Port Banias once in October 2015.

45.     The petroleum tanker Golden Sea delivered liquefied petroleum gas to Port Banias once in October 2015.

46.     On June 14, 2016, after both he and Milenyum had been designated, Mustafa Aydin, a Milenyum employee who was designated for coordinating Milenyum's petroleum shipments to Syria, asked for a payment of approximately $1,200,000 in regards to the June 11, 2016 discharge of LPG by the petroleum tanker Maestro.  A subsequent statement of account reflects that a payment of $1,210,351.98 was made.

47.     Similarly, another statement of account prepared by Aydin reflects that on August 17, 2016, after both he and Milenyum had been designated, a payment of $957,283.11 was made in regards to the August 13, 2016 discharge of 2,138.295 metric tons of LPG by the petroleum

tanker Golden Sea to Port Banias.

C.   <u>Voyages of the Petroleum Tanker Breithorn to Port Banias</u>

48.     The Breithorn is a combined chemical and oil tanker that operated in the Mediterranean and Black Seas in 2015.  It has the capacity to carry in excess of 17,000 metric tons of liquid petroleum products.

49.     During the period between February 2015 and April 2015, the Breithorn made at least three trips to Port Banias on behalf of Milenyum and/or Blue Energy.

50.     <u>Trip No. 1 – February-March 2015</u> – After docking at the bulk tank farm in Kulevi, Georgia, the Breithorn traveled into the Mediterranean Sea.  On or about March 25, 2015, while it was between Cyprus and Turkey and traveling in the direction of Syria, it turned off its AIS.  The location where it turned off its AIS was in the same vicinity that the Sea Light turned off its AIS on its trips to Port Banias.  The Breithorn re-enabled its AIS on March 5, 2015.  The intervening time was sufficient for the tanker to travel to Port Banias, unload its petroleum cargo and then depart Port Banias to pick up its next load of cargo.

51.     <u>Trip No. 2 – March-April 2015</u> – After leaving Port Banias on March 5, 2015, the Breithorn traveled to the bulk tank farm near Volna, Russia and traveled back toward Port Banias.  On or about March 29, 2015, as it was approaching Port Banis, the Breithorn turned off its AIS, which remained off until April 3, 2015.  The intervening time was sufficient for the tanker to travel to Port Banias, unload its petroleum cargo and then depart Port Banias to pick up its next load of cargo.

52.     <u>Trip No. 3 – April 2015</u> – After leaving Port Banias on April 3, 2015, the Breithorn traveled to the petroleum terminal in Kulevi, Georgia.  It departed the Kulevi terminal on or about April 16, 2015 and traveled back to Port Banias, where it remained from April 24, 2015 to April

30, 2015.  The intervening time was sufficient for the tanker to travel to Port Banias, unload its petroleum cargo and then depart Port Banias.

      D.      <u>Voyages of Multiple Petroleum Tankers Associated with Benelux to Banias</u>

      53.      Benelux is a United Arab Emirates based company purportedly involved in the global gas market.  This company manages a fleet of petroleum tankers that have delivered petroleum to Port Banias on numerous occasions.

      54.      One of the tankers managed by Benelux is the "Gitta Gas," a liquidfied petroleum gas ("LPG") tanker.   AIS shows that this tanker ported at Port Banias on or about at least the following five dates: April 5, 2015, May 31, 2015, June 1, 2015, July 15, 2015 and February 16, 2016.  The Gitta Gas also ported at Port Banias once in September 2015 and once in October 2015.  As described previously, many of the companies and infrastructure near Port Banias have been designated by OFAC as part of the Government of Syria.

      55.      A second tanker managed by Benelux was the "Warwick Gas," which at some point changed its named to the "Iris Gas."  The Warwick Gas ported at Port Banias on at least the following eight occasions: 1) December 2014; 2) December 2014; 3) January 2015; 4) January 2015; 5) September 2015; 6) September 2015; 7) October 2015; and 8) October 2015.  As described previously, many of the companies and infrastructure near Port Banias have been designated by OFAC as part of the Government of Syria.

      56.      Benelux has also assisted Milenyum to enable ship-to-ship transfers of petroleum.  On August 26, 2016, Benelux and Milenyum worked together to enable a ship-to-ship transfer between the "ISIS Gas," which is managed by Benelux, and the petroleum tanker "Maestro," which was previously designated by OFAC as the "Green Light" for its connection to Milenyum.

      57.      In another instance, Benelux and Milenyum were involved in a ship-to-ship transfer

of petroleum products from the ISIS Gas, which Benelux manages, to the petroleum tanker "Golden Sea." The Golden Sea was previously designated under a different name–the "Blue Way." The Blue Way was registered to Milenyum, but was re-named and re-registered after OFAC imposed sanctions against Milenyum.

## III.   Description of Defendant Funds

58.     Based upon the ongoing relationship between Milenyum, Blue Energy and the various owners of the tankers discussed above, and in order to pay for the deliveries of the fuel discussed above, Milenyum and Blue Energy made a series of payments for the deliveries to Port Banias described above.

59.     However, because the deliveries were to designated entities at a Syrian port, Milenyum, Blue Energy and their coconspirators used a series of front companies to make a series of payments in U.S. dollars. In a further effort to obfuscate their conduct, these payments did not correspond directly to each shipment. Rather, given the historical relationship of these entities and the manner in which they conducted their business, they regularly transferred various amounts of U.S. dollars to cover the shipments to Port Banias until the debts for those shipments were satisfied.

### A.   $6,819,750.00 (Target Funds 1) and $4,947,700.00 (Target Funds 2) in the name of Milenyum sent by Nojoom held at a U.S. Bank 1

#### 1. Background on Nojoom as a Front Company

60.     As noted above, Naser was indicted on June 12, 2018 for laundering U.S. dollars in relation to the shipment of jet fuel and other items to designated entities in Syria. As described in the indictment, on or about October 11, 2011, Naser assisted a Russian shipping company, JSC Sovfracht ("Sovfracht"), in wiring approximately $128,635.96 to Person 1 in Syria. The U.S. bank processing the transaction blocked the payment because it was intended for a country subject to sanctions. Six days later, Sovfracht and Naser caused another wire payment to be transferred. The

wiring instructions listed a beneficiary in Lebanon, but listed Person 1 in Syria in the wire instructions.  After a U.S. bank blocked the second attempted wire payment, Naser used Nojoom and Crimson General Trading, another company based in the United Arab Emirates, as front companies to complete the transaction in U.S. dollars to Person 1.  Naser failed to obtain approval from OFAC before transacting with Person 1 in violation of U.S. sanctions against Syria.

61.     In total, Sovfracht sent approximately $743,116.80 to Nojoom.  These payments were for the importation of goods in Tartous, Syria, another major Syrian port.  The agent for these shipments was SHIPCO, which was designated by OFAC on August 3, 2015 for its connection to the Assad regime.

62.     On September 1, 2016, OFAC designated Sovfracht, prohibiting Sovfracht from engaging in any U.S.-dollar transactions that occurred in whole or in part in the United States, and prohibited any good, technology, or services from being exported, re-exported, sold or supplied, directly or indirectly, from the United States to Sovfracht.  After Sovfracht was designated, it continued sending U.S. dollars to Nojoom using a shell company named Maritime Assistance.  In total, Maritime Assistance sent Nojoom approximately $1,476,007.93.

2.     Nojoom as a Front Company for Milenyum

63.     Nojoom also facilitated at least $18,787,110.00 in U.S. dollar wires for Milenyum on multiple occasions.  $11,767,450.00 of these funds were blocked while passing through the U.S. financial system and constitute the $6,819,750.00 (Target Funds 1) and $4,947,700.00 (Target Funds 2) of funds in the name of Milenyum sent by Nojoom and held at U.S. Bank 1.

64.     On January 20, 2015, Nojoom wired Milenyum two payments of $1,475,220.00 and $2,848,520.00 using U.S. Bank 1 as a correspondent bank during the time when the Sea Light

was at Banias and the AIS was off.  The wire listed "OBI=Cost of Petroleum Products"[5] on the wiring instructions.

66.     On February 5, 2015, Nojoom wired Milenyum $2,695,920.00 using U.S. Bank 1 as a correspondent bank.  The wire listed "OBI=Cost of Petroleum Products" on the wiring instructions.

66.     On February 23, 2015, Nojoom attempted to send an international wire to Milenyum for $6,819,750.00 through U.S. Bank 1 as a correspondent bank.  This wire was blocked while passing through U.S. Bank 1.  Shortly thereafter, on February 25, 2015, Nojoom attempted to send another international wire to Milenyum for $4,947,700.00.  This wire was blocked while passing through U.S. Bank 2 as a correspondent bank.  These funds constitute the $6,819,750.00 and $4,947,700.00 of funds in the name of Milenyum sent by Nojoom named in this complaint (referred to hereinafter as "Target Funds 1 and 2").

67.     OFAC designated Milenyum in part because Wael Abdulkarim of the Abdulkarim Group, using the Syrian company The Eagles LLC ("The Eagles") as a front company, sent Milenyum $5 million dollars for a shipment of petroleum products to Syria.  Specifically, Wael Abdulkarim, sent an email stating that The Eagles supplied petroleum products to Syria in 2014 and 2015 and referenced Target Funds 1 and 2.  Wael Abdulkarim also sent a second email which attached Milenyum / Nojoom pro forma invoices for gasoil shipments valued at $6,819,780 and $4,947,730.  These values correspond to the monetary values of Target Funds 1 and 2.  OFAC designated Wael Abdulkarim for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, directly or indirectly,

---

[5] In a wire transfer, the letters "OBI" stand for "Originator to Beneficiary Information." This is one of the fields in a wire transfer application that a sender may fill in to provide additional information regarding the wire.

Pangates and the Government of Syria on December 17, 2014, making this U.S.-dollar wire a violation of sanctions against Wael Abdulkarim.

### B. $3,999,775.90[6] of funds in the name of Blue Energy sent by Al Reef held at a U.S. bank

68.     Blue Energy, a Nevis[7]-based company, was designated by OFAC for being owned and controlled by Milenyum.  Several factors led to this designation.  First, Blue Energy was the consignee for the petroleum tanker Blue Dream, which was exclusively managed by Milenyum.  Second, multiple designated Milenyum employees were involved with numerous Blue Energy contracts.  Third, one of the directors of Milenyum, Erkan Duzoren, was also the director of Blue Energy.  Finally, Milenyum's operations director, instructed others to transfer funds into Blue Energy's bank account.

69.     From January through April 2015, Blue Energy received at least $16,350,000 from Al Reef.

70.     Al Reef and Al Khayal Trading FZCO ("Al Khayal") are closely related companies that frequently work together to facilitate payments made to, among other companies, Blue Energy.  Al Reef and Al Khayal are shell companies created by Shams and Bahr Trading Co., LLC, a United Arab Emirates company (also known as Sun and Sea Trading, "Sun and Sea").  Sun and Sea is a company that processes payments as a third party in various types of transactions.  Al Reef's website lists the same United Arab Emirates phone numbers as Sun and Sea and lists Sun and Sea as its location on the Contact Us page.

---

[6]     As noted *supra*, the $3,999,775.90 of funds in the name of Blue Energy Trade LTD Co. are composed of six payments made over a two day period (April 21 and 22, 2015) totaling $3,999,775.90.

[7] Nevis is a small island in the Caribbean Sea that is part of the country of Saint Kitts and Nevis.

71.     Al Reef frequently operates in tandem with Al Khayal. Al Khayal used one of the same phone numbers as Sun and Sea and Al Reef when sending U.S. dollar wires.  Furthermore, the formatting of the websites of these three entities share some of the same formatting, icons, and text, therefore suggesting that these websites were created by the same person or from the same template.

72.     All known payments sent by Al Reef and Al Khayal to Blue Energy were sent with wire instructions stating that the payment was for the importation of gasoil.

73.     Additionally, the payments sent by Al Reef and Al Khayal to Blue Energy listed the same invoice numbers, consistent with both companies working in tandem to make payments on behalf of third parties.  In fact, Al Reef and Al Khayal, acting as front companies, have sent similar wires to a U.S. petroleum company that were made on behalf of a third party in Iraq who was attempting to avoid quality control tests.

74.     Six payments from Al Reef, totaling $3,999,775.90, were sent to Blue Energy from April 21, 2015 through April 22, 2015 ("Target Funds 3").  Prior to these funds being blocked, Al Reef was able to transfer over $13 million through U.S. correspondent accounts to a bank based in Turkey.  Instructions accompanying all of these payments specifically stated that the payment was for the importation of petroleum products.   Moreover, the April 21, 2016 and April 22, 2016 payments were closely aligned with specific deliveries of gasoil to Port Banias – they fell between Trip No. 6 of the Sea Light (which occurred between March 29, 2015 and April 12, 2015) and Trip No. 7 of the Sea Light (which occurred between April 17, 2015 and May 10, 2015).  See ¶ 35, supra.

75.     These payments are also consistent with the February 11, 2015 charter of the Sea Light by Milenyum for the delivery of petroleum products to Port Banias.  See ¶ 35, supra.

**C.** **$ 2,991,000.00 of funds in the name of Blue Energy sent by Inpenta Group LP held at a U.S. bank**

76.     Inpenta Group ("Inpenta") is a limited partnership in the United Kingdom made up of two partners, which are both located at the same address in Seychelles.   The Department of State has classified the Seychelles as a Jurisdiction of Primary Concern for money laundering.

77.     On May 1, 2015, Inpenta attempted to wire $2,991,000.00 to Blue Energy through U.S. Bank 2 as a correspondent bank ("Target Funds 4"), but these funds were blocked in transit. These funds, like Target Funds 3, were destined for Blue Energy via a bank based in Turkey.

78.     As described previously, Blue Energy was designated by OFAC for being controlled by Milenyum.

79.     Pursuant to "Contract Number 011715" between Blue Energy and Inpenta, dated April 17, 2015, Blue Energy agreed to sell Inpenta approximately 6,000 metric tons of Russian origin gasoil from Batumi, Georgia "for further sale within the internal market of Georgia", which was to be unloaded between May 1, 2015 and May 10, 2015.  As described previously, on or about April 17, 2015 the Sea Light received petroleum from Kulevi, Georgia.  The Sea Light disabled its AIS from April 30 through May 11, 2015 as it made its way towards Port Banias.  This petroleum was delivered to Port Banias on or about May 2, 2015.

80.     These payments are also consistent with the February 11, 2015 charter of the Sea Light by Milenyum for the delivery of petroleum products to Port Banias.

**D.** **$1,380,738.31 in the name of Blue Energy sent by Benelux Overseas DMCC held at a U.S. bank**

81.     On April 27, 2015, Benelux attempted to send Blue Energy $1,380,738.31, using U.S. Bank 2 as a correspondent bank, from a bank based in the United Arab Emirates ("Target

Funds 5"). This payment is closely aligned with the deliveries by the petroleum tanker Gitta Gas to Port Banias on or about April 5, 2015 and May 31, 2015, as discussed in paragraph 50, supra.

82.     Even after Mustafa Ayadin was designated, he continued to assist Milenyum and Benelux to violate US sanctions by coordinating shipments of petroleum products and the payments therefor.  On August 26, 2016, Aydin, sent a shipping document for the petroleum tanker "Azeri Gas," which was involved in a ship-to-ship transfer with the ISIS Gas.  Aydin listed Benelux as the shipper.  In a separate document from August 2016, Aydin sent a statement of accounts in a spreadsheet with tabs for U.S. Dollars, Euros, Turkish Lira, and Dirham from the United Arab Emirates.  Any payment to Aydin in U.S. dollars after he was designated was a violation of OFAC-imposed sanctions.  The U.S. dollar tab of the statement of accounts showed that $588,000 was transferred in connection with the Azeri Gas on August 19, 2016 to Aydin, in violation of the sanctions against him.

IV.     Milenyum's Admission that its Shipments to Syria were Illicit

83.     On August 26, 2016, approximately one year after OFAC designated Milenyum, Ufuk Kenar, one of Milenyum's principals, coordinated with a representative of a European company ("Company 1") about a draft settlement agreement ("the Agreement"), which detailed a number of unpaid expenses. The Agreement acknowledged that Milenyum had chartered a petroleum tanker named the "Sea Light" for multiple voyages involving the shipment of petroleum products to Port Banias.  The purpose of the agreement was to settle fees the parties incurred while transporting petroleum products from Russia and Georgia to Port Banias.  The Agreement further acknowledged that Milenyum had been designated by OFAC on August 3, 2015.

84.     On November 14, 2016, Kenar sent an email with proposed changes to the Agreement to Company 1.  In this draft, he removed all references to Port Banias, Syria, but he

included a statement indicating that he knew that sending U.S. dollars as payment to Company 1

would violate various sanctions imposed by OFAC.

\* \* \*

85.     In conclusion, Milenyum and Blue Energy coordinated the shipment of petroleum

products to multiple designated entities in Syria.  Most of the payments for these shipments were

sent by shell companies such as the companies identified in this complaint.  Milenyum employees,

including Ufuk Kenar, knew that sending money through the U.S. financial system was a violation

of sanctions; indeed, Milenyum and its affiliates continued to receive money that transited the U.S.

financial system even after U.S. banks blocked their transactions.

### COUNT ONE — FORFEITURE
### (18 U.S.C. § 981(A)(1)(A))

86.     The United States incorporates by reference the allegations set forth in Paragraphs

1 to 85 above as if fully set forth herein.

87.     Milenyum, Blue Energy, Nojoom, Al Reef, Inpenta, Benelux and others, known

and unknown, acted individually and conspired to transport, transmit, or transfer the

$20,138,964.21 in defendant properties, to wit, Target Funds 1 through 5, to a place inside the

United States from or through a place outside the United States, with the intent to promote the

carrying on of violations of IEEPA, in violation of Title 18, United States Code, Sections 1956(h)

and 1956(a)(2)(A).

88.     As such, the Defendant Funds are subject to forfeiture to the United States, pursuant

to Title 18, United States Code, Section 981(a)(1)(A), as property involved in transactions in

violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A), or as any property

traceable to such property.

## COUNT TWO — FORFEITURE
### (18 U.S.C. § 981(A)(1)(C))

89.  The United States incorporates by reference the allegations set forth in Paragraphs 1 to 85 above as if fully set forth herein.

90.  Milenyum, Blue Energy, Nojoom, Al Reef, Inpenta, Benelux and others known and unknown acted individually and conspired together to conduct transactions involving the sale of goods in U.S. dollars, specifically, the attempted transmission of Target Funds 1 through 5 for purposes of payment to sanctioned entities, in violation of IEEPA, Title 50, United States Code, Section 1705; and the conspiracy statute, Title 18, United States Code, Section 371.

91.  As such, the defendant properties are subject to forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), as property, real or personal, which constitutes or is derived from proceeds traceable to a conspiracy to violate Title 50, United States Code, Section 1705.

*    *    *

PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the defendant properties as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: June 27, 2019
      Washington, DC

                                      Respectfully submitted,

                                      JESSIE K. LIU
                                      UNITED STATES ATTORNEY
                                      D.C. Bar Number 472845

                                      By:                      /s/
                                        Arvind K. Lal, D.C. Bar No. 389496
                                      Assistant United States Attorney
                                      Chris Kaltsas, N.J. Bar No. 158592016
                                      Special Assistant United States Attorney
                                      555 Fourth Street, NW
                                      Washington, DC 20530
                                      Arvind.Lal@usdoj.gov
                                      Chris.Kaltsas@usdoj.gov
                                      (202) 252-7688 (Lal)
                                      (202) 252-7785 (Kaltsas)

                                      *Attorneys for the United States of America*

## **<u>VERIFICATION</u>**

I, Samuel Small, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 27th day of, 2019.


_____*/s/ Samuel Small*_____
Samuel Small
Special Agent
Federal Bureau of Investigation

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>$6,819,750.00 OF FUNDS IN THE NAME OF MILENYUM ENERGY SA;<br><br>$4,947,700.00 OF FUNDS IN THE NAME OF MILENYUM ENERGY SA;<br><br>$3,999,775.90 OF BLOCKED FUNDS IN THE NAME OF BLUE ENERGY TRADE LTD CO.;<br><br>$2,991,000.00 OF BLOCKED FUNDS IN THE NAME OF BLUE ENERGY TRADE LTD CO.; and<br><br>$1,380,738.31 OF BLOCKED FUNDS IN THE NAME OF BLUE ENERGY TRADE LTD CO.<br><br>                Defendants. | Civil Action No. _____ |

## WARRANT FOR ARREST *IN REM*

TO:   THE UNITED STATES MARSHAL'S SERVICE AND/OR ANY OTHER DULY AUTHORIZED LAW ENFORCEMENT OFFICER:

        WHEREAS a Verified Complaint for Forfeiture *In Rem* has been filed in the United States District Court for the District of Columbia, on the 27th day of June, 2019, alleging that the above defendant properties are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1);

        YOU ARE, THEREFORE, HEREBY COMMANDED to serve the defendant properties, thus bringing, within the jurisdiction of the Court, said defendant properties, more fully described as:

1

**$6,819,750.00 OF FUNDS IN THE NAME OF MILENYUM ENERGY SA;**

**$4,947,700.00 OF FUNDS IN THE NAME OF MILENYUM ENERGY SA;**

**$3,999,775.90 OF BLOCKED FUNDS IN THE NAME OF BLUE ENERGY TRADE LTD CO.;**

**$2,991,000.00 OF BLOCKED FUNDS IN THE NAME OF BLUE ENERGY TRADE LTD CO.; and**

**$1,380,738.31 OF BLOCKED FUNDS IN THE NAME OF BLUE ENERGY TRADE LTD CO.**

YOU ARE FURTHER COMMANDED, promptly after execution of this process, to file the same in this Court with your return thereon, identifying the individuals upon whom copies were served and the manner employed, unless, pursuant to Rule G(3)(c)(ii)(A) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the defendant properties are in the government's possession, custody, or control.

Dated: June 27, 2019

_____

Clerk of the Court

By: _____

Deputy Clerk

## CIVIL COVER SHEET

JS-44 (Rev. 5/12 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America<br>c/o U.S. Attorney's Office<br>555 Fourth Street, N.W.<br>Washington, D.C. 20530 [+] | $6,819,750.00 OF FUNDS IN THE NAME OF MILENYUM ENERGY SA; $4,947,700.00 OF FUNDS IN THE NAME OF MILENYUM ENERGY SA, et al. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Arvind K. Lal, AUSA (202) 252-7688
Chris Kaltsas, SAUSA (202) 252-7785
United States Attorney's Office for the District of Columbia
555 Fourth Street, N.W., 11th Floor
Washington, DC 20530 [+]

ATTORNEYS (IF KNOWN)

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (●) 1 U.S. Government Plaintiff
- ( ) 2 U.S. Government Defendant
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ( ) 1 | ( ) 1 | Incorporated or Principal Place of Business in This State | ( ) 4 | ( ) 4 |
| Citizen of Another State | ( ) 2 | ( ) 2 | Incorporated and Principal Place of Business in This State | ( ) 5 | ( ) 5 |
| Citizen or Subject of a Foreign Country | ( ) 3 | ( ) 3 | Foreign Nation | ( ) 6 | ( ) 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

( ) **A.** *Antitrust*

- [ ] 410 Antitrust

( ) **B.** *Personal Injury/Malpractice*

- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Medical Malpractice
- [ ] 365 Product Liability
- [ ] 367 Health Care/Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Product Liability

( ) **C.** *Administrative Agency Review*

- [ ] 151 Medicare Act

**Social Security**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**Other Statutes**
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 890 Other Statutory Actions (If Administrative Agency is Involved)

( ) **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

(●) **E.** *General Civil (Other)*        OR        ( ) **F.** *Pro Se General Civil*

**Real Property**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent, Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**Personal Property**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**Bankruptcy**
- [ ] 422 Appeal 27 USC 158
- [ ] 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Conditions
- [ ] 560 Civil Detainee – Conditions of Confinement

**Property Rights**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

**Federal Tax Suits**
- [ ] 870 Taxes (US plaintiff or defendant)
- [ ] 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [x] 690 Other

**Other Statutes**
- [ ] 375 False Claims Act
- [ ] 400 State Reapportionment
- [ ] 430 Banks & Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions
- [ ] 470 Racketeer Influenced & Corrupt Organization

- [ ] 480 Consumer Credit
- [ ] 490 Cable/Satellite TV
- [ ] 850 Securities/Commodities/Exchange
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding  ○ 2 Remand from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi-district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
18 U.S.C. Sections 981(a)(1)(C)-forfeiture of property constituting or derived from proceeds traceable to ...

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☐  NO ☒ |
|---|---|---|---|
| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☒  NO ☐ | If yes, please complete related case form |

DATE: _____06/27/2019_____   SIGNATURE OF ATTORNEY OF RECORD /s/ Arvind K. Lal

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.  CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should endure the accuracy of the information provided prior to signing the form.